```
 1                  IN THE UNITED STATES DISTRICT COURT

 2                  IN AND FOR THE DISTRICT OF DELAWARE

 3                              - - -
       ROBERT M. GLEN,
 4                                        :   CIVIL ACTION
                Plaintiff,                :
 5     v                                  :
                                          :
 6     TRIPADVISOR LLC, TRIPADVISOR, INC.,    :
       ORBITZ, LLC, TRIP NETWORK, INC. d/b/a  :
 7     CHEAPTICKETS, KAYAK SOFTWARE CORPORATION, :
       and BOOKING HOLDINGS, INC.,        :
 8                                        :   NO. 19-1809-LPS
                Defendants.
 9     ----------------------------------------
       ROBERT M. GLEN,
10                                        :   CIVIL ACTION
                Plaintiff,                :
11     v                                  :
                                          :
12     VISA, INC., VISA U.S.A. INC., VISA    :
       INTERNATIONAL SERVICE ASSOCIATION,  :
13     MASTERCARD INCORPORATED, and        :
       MASTERCARD INTERNATIONAL INCORPORATED,  :  NO. 19-1870-MN
14                Defendants.

15                              - - -

16                      Wilmington, Delaware
                     Thursday, December 7, 2020
17                   Telephonic Motions Hearing

18                              - - -

19     BEFORE:        HONORABLE LEONARD P. STARK, Chief Judge

20     APPEARANCES:                     - - -

21
                    ANDREWS & SPRINGER LLC
22                  BY:  JESSICA ZELDIN, ESQ.

23                         and

24
                                       Brian P. Gaffigan
25                                     Official Court Reporter
```

```
 1    APPEARANCES:   (Continued)

 2              REID COLLINS & TSAI LLP
              BY:   CRAIG A. BONEAU, ESQ., and
 3                  RYAN M. GOLDSTEIN, ESQ.
                    (Austin, Texas)
 4
                         Counsel for Robert F. Glen
 5
              POTTER ANDERSON & CORROON, LLP
 6            BY:   JONATHAN CHOA, ESQ.

 7                  and

 8            WALDEN MACHT & HARAN, LLP
              BY:   JACOB GARDENER, ESQ.
 9                  (New York, New York)

10                       Counsel for TripAdvisor LLC and
                         TripAdvisor, Inc.
11
              MORRIS NICHOLS ARSHT & TUNNELL, LLP
12            BY:   JOHN D. DiTOMO, ESQ.

13                  and

14            BAKER McKENZIE
              BY:   MICHAEL A. DUFFY, ESQ.
15                  (Chicago, Illinois)

16                       Counsel for Kayak Software Corporation
                         and Booking Holdings Inc.
17
              BALLARD SPAHR LLP
18            BY:   BETH MOSKOW-SCHNOLL, ESQ.

19                  and

20            SCOTT DOUGLASS & McCONNICO, LLP
              BY:   DAVID SHANK, ESQ., and
21                  STEPHANIE KOVER, ESQ.
                    (Austin, Texas)
22
                         Counsel for Expedia, Inc., Expedia
23                       Group, Inc., Hotels.com LP, Hotels.com
                         Group GP, LLC, Travelscape, LLC d/b/a/
24                       Travelocity, Orbitz, LLC, and Trip
                         Network, Inc., d/b/a Cheap Tickets
25
```

```
 1    APPEARANCES:   (Continued)

 2
                    YOUNG CONAWAY STARGATT & TAYLOR, LLP
 3                  BY:  MICHAEL SEAN NEIBURG, ESQ.

 4                       and

 5                  SIDLEY AUSTIN, LLP
                    BY:  DAVID WILLIAM McALOON, ESQ., and
 6                       KWAKU A. AKOWUAH, ESQ.
                         (Washington, District of Columbia)
 7
                            Counsel for MasterCard Incorporated
 8                          and MasterCard International
                            Incorporated
 9

10                  BALLARD SPAHR LLP
                    BY:  BETH MOSKOW-SCHNOLL, ESQ.
11
                         and
12
                    AKERMAN LLP,
13                  BY:  MARTIN DOMB, ESQ.
                         (New York, New York)
14
                         and
15
                    AKERMAN LLP,
16                  BY:  LORAYNE PEREZ, ESQ.
                         (Miami, Florida)
17
                            Counsel for Visa Inc., Visa U.S.A.
18                          Inc., and Visa International Service
                            Association
19

20                  COOCH & TAYLOR, P.A.
                    BY:  CARMELLA KEENER, ESQ.
21
                         and
22
                    DUBBIN & KRAVETZ, LLP
23                  BY:  SAMUEL J. DUBBIN, ESQ.
                         (Coral Gables, Florida)
24
                            Counsel on behalf of Amici Curiae
25                          Dan Burton and Robert Torricelli
```

```
 1                           - oOo -

 2                   P R O C E E D I N G S

 3              (REPORTER'S NOTE:  The following telephonic oral

 4      argument was held remotely, beginning at 12:35 p.m.)

 5              THE COURT:  Good afternoon, everybody.  This is

 6      Judge Stark.  We're here in two related actions, and both of

 7      them I believe the plaintiff is the same and represented by

 8      the same counsel.  Let's begin by putting your appearance on

 9      the record, please.

10              MS. ZELDIN:  Thank you, Your Honor.  This is

11      Jessica Zeldin from Andrews & Springer on behalf of

12      plaintiff Robert Glen in both of the Civil Actions.  With me

13      on the line is Craig Bono and Ryan Goldstein from Reid

14      Collins & Tsai.  Both have been admitted pro hac vice, and

15      Mr. Bono will be making today's presentation on behalf of

16      the plaintiffs in both cases.

17              THE COURT:  Okay.  That's fine.  Good afternoon

18      to all of you.

19              In the 19-1809 action, who is there for the

20      TripAdvisor defendants, please?

21              MR. CHOA:  Good afternoon, Your Honor.  This

22      is Jonathan Choa from Potter Anderson.  And with me is

23      co-counsel, Jacob Gardener from Walden Macht & Haran.

24              MR. GARDENER:  Good afternoon, Your Honor.

25              THE COURT:  Good afternoon.  And in that same
```

1    action, who is there for the other defendants -- well,

2    actually for the Kayak and Booking defendants, please.

3                    MR. DiTOMO:  Good afternoon, Your Honor.  This

4    is John DiTomo at Morris Nichols Arsht & Tunnell.  And with

5    me on the line is my colleague, Michael Duffy.

6                    MR. DUFFY:  Good afternoon.

7                    THE COURT:  Yes.  State your colleague's name

8    again, please?

9                    MR. DiTOMO:  Michael Duffy.

10                    THE COURT:  Duffy.  Okay.  Yes, good afternoon

11    to you both.

12                    MR. DUFFY:  Good afternoon.  It's Michael Duffy.

13                    Just so the Court is aware, the defendants

14    have decided in both cases that I would be making one

15    presentation because the arguments are the same, and then

16    there will be rebuttal if the Court allows it, but I just

17    want to let the Court know that we decided to make this

18    less of a multiparty show, so to speak.  So I will be making

19    the primary presentation.  This is Mr. Duffy from Baker

20    McKenzie.

21                    THE COURT:  Okay.  I appreciate that.  Thank you

22    very much.

23                    And in this same action, who is there for the

24    remaining defendants, please?

25                    MS. MOSKOW-SCHNOLL:  Hi, Your Honor.  It's Beth

1    Moskow-Schnoll from Ballard Spahr.  And with me is David

2    Shank, and Stephanie Kover of Scott Douglass McConnico.  And

3    we represent the Expedia entities.  And if the Court allows,

4    David Shank will be making the rebuttal argument on behalf

5    of all the defendants.

6              THE COURT:  Okay.  Thank you.  Good morning to

7    all of you.

8              In the 19-1870 case, who is there for the

9    MasterCard defendants, please?

10              MR. NEIBURG:  Good afternoon, Your Honor.  It's

11    Michael Neiburg from Young Conaway, joined by co-counsel

12    Sidley Austin, David McAloon and Kwaku Akowuah.

13              THE COURT:  Okay.  Good afternoon to you all.

14              And finally I think it is for the Visa

15    defendants, please.

16              MS. MOSKOW-SCHNOLL:  Your Honor, it's Beth

17    Moskow-Schnoll from Ballard Spahr again.  And with me are

18    Martin Domb and Lorayne Perez of Akerman on behalf of Visa.

19              THE COURT:  Okay.  Good afternoon to you as well.

20              My court reporter should be on the line.  And

21    for the record, as I said it is two related cases.  Both

22    involve the plaintiff Robert M. Glen.  In the first action,

23    it is versus TripAdvisor, LLC, et al, and that is Civil

24    Action No. 18-1809-LPS.  In the second action, it is

25    Robert M. Glen versus Visa Inc., et al, Civil Action No.

```
 1    19-1870-LPS.  And this is the time we set for argument on

 2    the various motions to dismiss, which raised a number of

 3    issues.

 4             If I understood correctly but I do want to

 5    confirm, the way the defendants propose to proceed is that

 6    we would hear from Mr. Duffy first on all the motions and

 7    whatever arguments the defendants want to be heard on, then

 8    we would turn it over to plaintiff, and then we would hear I

 9    think from Mr. Shank as rebuttal on behalf of all of the

10    defendants.

11             Mr. Duffy, is that what the defendants propose?

12             MR. DUFFY:  It is, Your Honor, with one caveat.

13    To the extent that the MasterCard and Visa defendants wish

14    to, you know, make any extra points, Mr. Shank and I have

15    agreed we will use our a little bit of extra time at the end

16    his rebuttal, but that is how it is going to proceed if the

17    Court is okay with that.

18             THE COURT:  Okay.

19             MS. KEENER:  Good afternoon.

20             THE COURT:  Yes, go ahead.

21             MS. KEENER:  I'm sorry.  Good afternoon.  This

22    is Carmella Kenner of Cooch & Taylor, and I filed papers

23    on behalf of the amici curiae, Dan Burton and Robert

24    Torricelli.  I just wanted to let Your Honor know that I am

25    on the line with my co-counsel, Samuel Dubbin of Dubbin &
```

1    Kravetz.  And Mr. Dubbin has reserved some time out of

2    the plaintiff's allotment I believe and will make the

3    presentation on behalf of Mr. Burton and Mr. Torricelli

4    today.

5              THE COURT:  Okay.  Thank you for that.  I

6    apologize for my oversight and good afternoon to both of

7    you.

8              MR. DUBBIN:  Good afternoon, Your Honor.

9              THE COURT:  Good afternoon, Mr. Dubbin.

10             Mr. Boneau, I believe you are going to be doing

11   the main argument for plaintiff.  Do you have any objection

12   to what the defendants have proposed?

13             MR. BONEAU:  I don't, Your Honor.  That sounds

14   fine with plaintiff.

15             THE COURT:  All right.  Then we'll proceed as

16   has been outlined subject to your time limits.

17             So, Mr. Duffy, you will be up first.

18             MR. DUFFY:  Thank you, Your Honor.  And may it

19   please the Court.

20             In this case, the plaintiff has filed several

21   different lawsuits all over the country alleging purported

22   violations of the Helms-Burton act.  Those cases have either

23   voluntarily or involuntarily been dismissed such that we are

24   down to two actual cases that remain.

25             And I think as the correspondence indicates, the

1    defendants are firmly of the belief that, and the law

2    makes it clear that one of the cases that plaintiff elected

3    to file, the Glen vs. American Airlines case precludes

4    plaintiff from pursuing this action.

5              The American Airlines case is related to the same

6    hotel, the same exact hotels filed by the same plaintiffs.

7    It contains identical issues of inheritance and perhaps most

8    importantly for purposes of collaterals estoppel, that case

9    also alleges the same injury, which is to say, plaintiff's

10   alleged injury in the American Airlines case was derived

11   from alleged trafficking, which is to say American Airlines

12   placement of reservations in subject hotels and earning

13   commissions therefrom.  Those issues with respect to standing

14   are identical to what has been presented in this case by

15   plaintiff.

16             THE COURT:  Now, couldn't it at least be

17   possible that it is slightly different?  That, you know, a

18   travel agency or somebody involved in various steps with

19   booking, is it materially different position in terms of

20   causing injury than an airline that flies you to Cuba?

21             MR. DUFFY:  Well, in this case, Your Honor, I

22   think the answer is no.  And I think I'm uniquely qualified

23   here because American Airlines system was literally placing,

24   placing reservations at the subject hotels, meaning it

25   would allow travelers to actually book reservations using a

platform that was designed by another online travel service provider.  So the actual injury is the same.  It is the booking of reservations in the subject hotels.

And I think what is critical here is the plaintiff, to its credit, does not dispute that.  The plaintiff does say that the issues are not identical with respect to scienter and lawful travel, but with respect to the underlying issue which is raised by standing, which is, is there an injury?  The injury that is alleged is the same with respect to both cases, as is the plaintiff, as are the hotels.

And what plaintiff says is, he doesn't endeavor to distinguish those critical factors.  He says that the Texas court got it wrong and invites this Court to basically review these same factual issues which were decided by the Texas court on its own accord and make its own determination.

The problem is in doing so, the plaintiff invites this Court to engage in what is effectively a collateral review of a sister District Court's factual determinations.

Now, all of the elements of collateral estoppel have been met here.  The issue was litigated.  As I'd said, the issues are identical.  The same counsel was present. The counsel that is on the line very ably represented Mr. Glen in Texas.  And the issue was necessary to the

disposition of the Glen case.

And there really is no response on those points with respect to standing other than, you know, Your Honor, you should take a second crack at this because we believe Texas got it wrong.

THE COURT:  Well, yes.  Unless there has been development, my understanding is that case is on appeal.  Is that right?

MR. DUFFY:  That's correct, Your Honor.  That's correct.  But for purposes of collateral estoppel, one of the cases on appeal doesn't matter.  It does not make the decision of the Court in Texas any less final and any less appealable.  It is a final order.

THE COURT:  Under Third Circuit law, my understanding was I have to make a determination as to whether the Texas decision is sufficiently firm.  And one of the factors in deciding that when the case is on appeal, which it is, is whether the litigation of the issue has reached such a stage that I see no really good reason for permitting it to be litigated again.

Do you agree that that's part of the standard I have to apply?  And if I do, then given that numerous courts have now addressed the standing question and not agreed with the Texas court, shouldn't I say that this issue hasn't reached the point where there is really no good reason to

1    keep litigating it?

2            MR. DUFFY:  Well, I do agree that that's part

3    of the standard that the Court has to consider.  And I think

4    if the Court is inclined to wait until the Fifth Circuit

5    decides, that is obviously within the Court's discretion,

6    and we would counsel the court rather than to rule on the

7    same facts differently than the Court in Texas, to hold the

8    matter in abeyance or stay this matter, dismiss it with

9    leave to refile pending resolution by the Fifth Circuit.

10           But the fact of the matter remains if the Court

11   were to issue a different decision, we would have competing

12   or possibly competing or dueling decisions going throughout

13   the federal system, one through the Fifth Circuit and one,

14   you know, we could have a totally different outcomes,

15   which would be both inefficient and I think, you know,

16   it's violative of the whole tenant, the whole purpose of

17   collateral estoppel.

18           THE COURT:  I'm sorry.  So there are numerous

19   other District of Florida cases.  Did none of them already

20   create that situation?

21           MR. DUFFY:  Well, those cases are not the same

22   hotels.  The unique thing here, Your Honor, is we have the

23   exact same hotels, the exact same plaintiff, the exact same

24   inheritance date, the exact same allegation of injury.

25           We have no other situation where you have two

separate federal courts opining on the same identical

issues.  And that is essentially what the two Glen matters

present.  And this is a result of the litigation strategy

pursued by plaintiff, but plaintiff has elected to pursue

its claims related to the same properties in different

courts throughout the country.  And this is a problem that

has been created by that strategy.

But unlike the federal decisions in Florida

which have rendered decisions on the standing, this is

unique.  This is a situation where if the Court were to

weigh in, you would essentially be doing so as really

reviewing what has already been reviewed by the Court in

Texas.

But even if this Court were to disagree and

were to say, you know, I don't think there is collateral

estoppel here, I don't think the issues are the same, I

don't think there is an identity of fact.  All of those

issue, even if the Court were to look past collateral

estoppel, this case should still be dismissed for I think

the singular reason that plaintiff, by his own admission,

admits that he inherited or came into possession of his

claim after the statutory bar date.

Now, every single federal case that has

considered this issue, i.e., where a plaintiff has come into

possession, through inheritance, by the way, of his or her

1    claim to a subject property after March 12th, 1996, those

2    cases have been dismissed.  And we have cited those in our

3    pleadings.

4          And I will note that additional authority from

5    the Southern District of Florida has come out following that

6    same precedent.

7          And in response to that precedent, in response

8    to the plain language argument about the statute, what

9    plaintiff does is engage in what I would describe as a very,

10    very strained interpretation of what "acquires" means.  And

11    under plaintiff's theory, "acquires" doesn't mean "inherited."

12          THE COURT:  Right.

13          MR. DUFFY:  That somehow --

14          THE COURT:  But help me on this.

15          MR. DUFFY:  Of course.

16          THE COURT:  He also makes the argument that your

17    view, which I recognize other courts have agreed with, but

18    that that interpretation leads to absurd results that it's

19    clear Congress did not intend.  Tell me why that is not the

20    case.

21          MR. DUFFY:  Well, of course.  To me, if you

22    look -- and to this point I'm going to refer briefly to the

23    amici.  If you look briefly at what Congress intended, there

24    is no language that has been cited that showed when Congress

25    put that date in the statute, the March 12th, 1996 date,

that they intended to create an exception for inherited property.  To the contrary, there is really nothing in the legislative history that has been cited lavishly that says that there was an exception for inherited property.

What is clear is Congress intended the March 12th, 1996 date to be an infliction point.  That property confiscated after that point could not be, could not be redressed.  And similarly for those individuals who came into possession of their claim after that point, they could not, through acquisition or through other means, could not seek redress.

Now, the reason for that is clear.  Congress wanted to state a point in time, a fixed point in time whereby individuals could or could not pursue their claims.

Now, plaintiff's point about absurdity I frankly don't understand.  I mean the fact of the matter is Congress can set a point, a fixed point whereby an individual may or must bring, must file suit.  Taking plaintiff's argument to its logical conclusion, there is really no limitation on when a plaintiff who comes into possession through inheritance of his claims can bring suit.

I mean you can see grandchildren, great grandchildren, great-great grandchildren, all the way out years and years into the future where there is no effective statute of limitations if you take what is plaintiff's

1    argument, if inheritance is to be read out of the definition

2    of "acquire."

3            And I would add that literally no authority,

4    no authority that has looked at this exact question has

5    followed the argument that plaintiff asserts.

6            THE COURT:  They suggest some of them have

7    considered expressly the "absurdity of results" argument.

8    Is that true or not true?

9            MR. DUFFY:  You know, I have not been present

10   for all of the oral arguments, Your Honor.  I represent my

11   clients in a number of these.  I can tell you the arguments

12   were made orally about this absurdity, but the inheritance

13   as opposed to acquire, I can't represent to the Court that

14   it has never been considered.  At least in the cases thus

15   far, no one has made the argument, to my knowledge.

16           THE COURT:  Talk about the distinction between,

17   we're talking about 6082(a)(4)(B), and then there is (C)

18   which applies to property confiscated after March of 1996.

19           The plaintiff believed that your position --

20   he says defendants so forgive me if defendants disagree on

21   this.  I don't recall.  But he says that defendants agree

22   that Glen would not be barred if he had acquired his

23   interest by inheritance after March of 1996.  Is that true?

24   And if so, why would that not be an arbitrary or absurd

25   result?

1            MR. DUFFY:  I don't think that is the case.  I

2     mean our view is if he has not acquired his claim by

3     March 12th of 1996, he is barred.  He is barred, period.

4            THE COURT:  Right.  I'm sorry.  I wasn't clear.

5     If the property had been confiscated after March of 1996 and

6     then he had acquired his interest by inheritance.  In that

7     circumstance, do you take the view that subsection C would

8     bar his claim?

9            MR. DUFFY:  Yes, yes, yes.  No, that has never

10    been tested, but that would by our understanding, yes.

11           THE COURT:  Okay.  So he would be barred either

12    way.  All right.

13           MR. DUFFY:  That's right.

14           THE COURT:  He asks, along the same vein, why

15    should an inherited claim that is actionable if the original

16    property owner died in 1995 suddenly become unactionable if

17    the same property owner dies in 1997?  What is the response

18    to that?

19           MR. DUFFY:  The response is Congress fixed a

20    date for a reason.  I mean, you know, it may seem arbitrary

21    to plaintiff, but the date meant something to Congress, and

22    Congress decided it.  Congress makes all sorts of decisions,

23    you know, fixing a point in time where parties can exercise

24    substantive rights.

25           And, you know, it may be an unfortunate thing in

1    terms of timing, but it is Congress who seeks that date and

2    elevated its importance and put it into the statute.  And

3    the language of the statute is clear.  That the acquisition

4    must be before March 12th of 1996.

5            And the idea that one cannot acquire property

6    through inheritance, I have looked at this issue now in

7    preparing for the oral argument because it is interesting.

8    I don't think I have seen a single case that says

9    acquisition necessarily does not mean inheritance.  People

10   acquire or obtain property through inheritance all the time.

11           So while the plaintiff may believe it is unfair

12   or arbitrary, that is a congressional decision, and Congress

13   obviously believed that this date was important because they

14   put it into the statute at several places.

15           THE COURT:  Now, I'm sure I will get the

16   same answer but let me ask nonetheless.  Glen directs me

17   to section 6082(a)(5)(C) which evidently was a two year

18   suspension of lawsuits based on uncertified claims which

19   would have barred suit under Title III for two years from

20   March 1996 even had the President not, you know, triggered

21   the exceptions.  And he says that just is further evidence

22   of the assert absurdity of your position because a certain

23   number of claims would have been extinguished in those two

24   years and, you know, how could Congress have intended that?

25           Anything to add on that one?

1          MR. DUFFY:  No, I think the argument remains the

2    same is that the date is in the statute for a reason.  And

3    it is clear that it is a demarcation point in the statute.

4    And I think the answer remains the same, Your Honor.  The

5    answer remains the same.

6          I'm happy to discuss with the Court our

7    arguments on constitutional standing, if the Court would

8    like me to.  The view here, which I think has been

9    articulated by the Court in Texas and others, is in this

10   case where the plaintiff at the time did not have an

11   interest in the property, it is difficult to articulate

12   what his injury is.  His injury is basically, if he was

13   restored to where he was status quo ante, he had no right to

14   the proceeds of any reservations in place in these hotels.

15   This is the classic example of a statutory right that really

16   exceeds the bounds of constitutional standing.

17          Now, I recognize that I've told the Court that

18   it is collaterally estopped from looking at the standing

19   issue.  We believe it was readily decided in Texas, but

20   there are a myriad of other reasons why, in addition to the

21   statutory bar date and standing, why this Court can and

22   should dismiss Mr. Glen's case.

23          The first of which is it is clear from the

24   statute that there is a scienter requirement.  It's clear.

25   And Mr. Glen has not pled a knowing or intentional

1    trafficking in the subject properties, despite three

2    attempts to do so.

3            And words matter.  And Mr. Glen has never pled

4    adequately, much less with specificity, that my clients and

5    the other defendants on the line knowingly trafficked in

6    these properties.  And there is ample authority out there,

7    albeit it is not in the majority but there is authority out

8    there that the scienter requirement means something.  And it

9    has to be pled with some level of specificity in order to

10   meet the pleadings standard.

11           THE COURT:  All right.  Focus, if you would, on

12   the period after you all got these notices, that I think

13   it's at least plausible to assume, expressly put you all on

14   notice that these properties were confiscated.  Why has he

15   not met the scienter standard even on your reading of the

16   statute for at least the period from the date you got those

17   notices?

18           MR. DUFFY:  Well, I think looking at those you

19   have to conflate what is the exception for lawful travel.

20   That all of the defendants on the phone, and particularly I

21   know for a fact mine as well, have very carefully, working

22   with professionals, been careful to make sure that anyone

23   who travels to Cuba does so lawfully or books a reservation,

24   does so lawfully.

25           And so the idea that plaintiff can make an

1   assertion in a letter that these properties were, you know,

2   confiscated and, ergo, that immediately satisfies the

3   scienter requirement that we are knowingly trafficking

4   conflicts with the language of the statute which creates an

5   exemption for lawful travel.

6          And that's a part of our pleading here, that

7   plaintiff cannot defeat the lawful travel exception which

8   is created in the statute.  And I think when you look at

9   the "knowing" requirement of the statute and then you look

10  at what's the exception "created by lawful travel," it's

11  clear that the mere sending of a letter restating an

12  accusation that we're trafficking isn't enough to establish

13  scienter at least with the specificity that is normally

14  required.

15         THE COURT:  If there is one defendant, I think

16  it was maybe Visa, that evidently contends that it changed

17  its behavior in response to the notice letter, how do I

18  factor that into the analysis?

19         MR. DUFFY:  Well, I think -- well, I'll let

20  Visa counsel address that, Your Honor, after rebuttal.

21  But I think the answer is Visa elected to change its

22  behavior evaluating what potential risks were.  That does

23  not mean that the other defendants, who looked at the lawful

24  exceptions, worked very carefully to make sure they adhered

25  with it, were somehow knowingly trafficking in the purported

1     properties.

2             So I think it may be relevant.  Visa evaluated

3     its litigation risks or made other considerations and Visa

4     can address that in the rebuttal, but with respect to those

5     entities that did not change the reservations or change

6     their pattern of reservations in the subject hotels, they

7     didn't do so because the statute creates a safe harbor

8     for them.  And so if you can simply allege that you are

9     trafficking and that is enough to satisfy the heightened

10    standard of knowing and intentional behavior, I would think

11    it would render the safe harbor null and void.

12            Briefly, Your Honor, on the amici.  We say in

13    our opposition papers that we don't believe the Court should

14    consider the briefs, but if the Court does, I would note

15    particularly with respect to whether "acquire" means

16    "inherit."

17            In several pages of citations to the

18    Congressional record, so there is literally not one

19    reference to inherited property being different from

20    acquired property or some sort of nuance, an acquisition is

21    different from inheritance.  What you see is there is ample

22    citation that the drafters of this legislation intended to

23    deter trafficking.

24            Well, that doesn't address the issue at hand

25    for the Court.  And so we all recognize here that the

```
 1    Helms-Burton legislation came out of a climate where the
 2    Congress and others wanted to make sure that individuals
 3    were not trafficking unlawfully in property that had been
 4    confiscated, but that does not address the central issues
 5    here, which is what is the purpose of the March 12th, 1996
 6    date, and what is the purpose of the language that one
 7    cannot bring a claim unless the national acquires ownership
 8    of the claim before March 12th, 1996.
 9              So in our view, while the citation to the
10    legislative history may be interesting for the overall
11    intent behind the statute, it's irrelevant to the question
12    that is being put before the Court today.
13              THE COURT:  Is the defendants' view that the
14    legislation history is completely silent on inheritance?
15              MR. DUFFY:  Well, at least I have -- and
16    admittedly, Your Honor, I have not reviewed the entirety of
17    the legislative history.  I have looked at what has been
18    cited by the amici as well as by plaintiff, and I have not
19    been able to find any basis in the legislative history
20    that it would make plain that the black letter definition of
21    "acquire" should somehow strike out "inherit" from it.
22              So that's a qualified answer to say I haven't
23    read the entirety of the legislative history, I have not,
24    but I have seen what seen and what has been cited does not
25    advance the ball proverbially as the plaintiffs in the amici
```

1    claim.

2              Your Honor, one last point, and I know you

3    raised it early on.

4              To the extent the Court is conflicted whether to

5    preclude plaintiff from advancing this case, based upon the

6    Texas actions, you know, the defendants are aware that there

7    are other considerations, particularly the finality of that

8    Texas case; and we would during the court to either, one,

9    dismiss the case without prejudice or to hold the case in

10   abeyance until such time that the Fifth Circuit clarified

11   the issue.

12             If there are no further questions, Your Honor,

13   I'm happy to field them or answer additional questions.

14   We'll defer our time for rebuttal and for Mr. Shank and for

15   anyone from MasterCard or Visa.

16             THE COURT:  Just a few more questions.  Thank

17   you.

18             On the lawful travel exception or carveout from

19   trafficking, the debate seems to be largely on whether who

20   has the burden on this, and whether the plaintiff has to

21   plead around it, and ultimately if the case went forward,

22   who would have to prove that the travel was lawful or not

23   lawful.

24             Help me.  What is the best argument for your

25   view?

1          MR. DUFFY:  Well, you know, Your Honor, I

2   recognize that there is authority that is going against us

3   here that basically says that whether traffic is lawful is

4   an affirmative defense.

5          Our view is that it is an element of the claim.

6   That there is a carveout for lawful travel, and it is

7   incumbent upon the plaintiff to demonstrate that this lawful

8   travel exception should not apply.

9          So we cite this.  We cite that authority in our

10  papers.  I recognize that there is conflicting authority

11  that goes the other way.  I think it makes much more sense

12  if the plaintiff is required to plead particularly given the

13  scienter requirement of the statute.

14          THE COURT:  I'm sorry.  You got interrupted

15  there.  Repeat that last sentence, please.

16          MR. DUFFY:  I think particularly given the

17  scienter requirement in the statute.  When you read those

18  two together, I think it makes clear that it is a burden on

19  the plaintiff to prove, one, that the violation, the traffic

20  was knowing and intentional and, two, that it isn't lawful.

21  That it wasn't lawful travel.  So I think when you read

22  those two components of the statute together, it is the

23  plaintiff's burden.

24          THE COURT:  Okay.  And then, just going back

25  to constitutional standing and injury for a second.

1              If the claim could be acquired by inheritance,

2    would the injury that the plaintiff's I think the aunt and

3    mother suffered, would that injury pass with the claim

4    through inheritance?

5              MR. DUFFY:  To me, the answer I think is no.

6    The injury I think necessarily is to the individual or

7    individuals who had ownership in the property who had the

8    property stripped from them.  Okay?

9              To the extent that the claim was acquired

10   and ownership of the property was never obtained by those

11   individuals, I don't think that they can subsequently

12   acquire a right to an injury that didn't exist or that

13   didn't exist at the time, if that makes sense.

14             I don't think the injury travels with the

15   subsequent inheritors or acquirers of the claim itself.

16   It's just too attenuated.

17             I mean the analogy, the analogy I like to think

18   about, Your Honor, if you own a watch and you have a son,

19   your son may have an inherited interest in that watch and

20   that watch is stolen from you and is subsequently sold.

21   Your son, though he has, you know, has an inherited or a

22   vested interest in that watch doesn't have the ability to

23   pursue a claim, to seek redress for it.  He doesn't.  You

24   do.  And the injury related to a subsequent sale of that

25   watch never attorns to the heir to that watch.

1              And I think that that's a useful way to think

2      about that.  These hotels were confiscated from their

3      owners.  The heirs may have had a vested remainder or

4      potential interest in those hotels, albeit, you know, they

5      never fully vested, but they cannot pursue an injury related

6      to the subsequent sale, at least as I think of injury in

7      fact under the constitutional standing requirement.

8              THE COURT:  Okay.  Thank you.  You have answered

9      my questions for now.  Thank you very much.

10             Whoever is up next may proceed.

11             MR. BONEAU:  Thank you, Your Honor.  This is

12     Craig Boneau from Reid Collin for plaintiff.  Good

13     afternoon.

14             I want to start with addressing an issue that

15     defendants sort of referenced a couple times about the

16     litigation strategy of plaintiff, not because I think it is

17     necessarily important to the issues at hand, but it does --

18     it sort of colors all of the issues that are presented,

19     particularly the collateral estoppel issue.

20             So, the defendants at least implied that

21     plaintiff's filing of suits in different jurisdictions

22     across the country was really an attempt to get different

23     jurisdictions to decide the issue in the hope at least one

24     of them would go plaintiff's way.

25             That is not at all what occurred.  Instead, the

reason plaintiff filed suits in various jurisdictions as
defendants well know because they were participated,
participated in bringing most of those cases into Delaware
was because personal jurisdiction could only be obtained in
particular jurisdictions across the country because of the
way jurisdiction and general jurisdiction has evolved over
the recent years.

So a number of plaintiffs or a number of
defendants could only be sued in Nevada, for example, or in
Washington state, for example, and not in Delaware.

Ultimately, the reason that the majority of these
cases are in Delaware is because many of the defendants were
incorporated in Delaware, thereby subjecting them to personal
jurisdiction there, and the ones that were Expedia entities
that sort of live under the Expedia umbrella, and Expedia
agreed to waive a personal jurisdiction defense in Delaware
for those entities, so that all of their companies could be
sued in one location, thereby having a more efficient means of
litigating the case.  So I just want to address that issue.

And to the extent that I know in the beginning
Mr. Duffy referenced that almost all of plaintiffs' cases
have been voluntarily or involuntarily dismissed, to be clear,
the voluntary dismissals there were on agreement so that we
could have all of these cases in one location and have an
efficient litigation versus having litigations spanning the

1   entire country.

2           So I just wanted to address that on the outset.

3           THE COURT:  I appreciate that.  And that is the

4   status there are no other cases at this point with your

5   client pending in District Courts?  And I'm aware of the one

6   appeal from Texas.  I don't know if there are there are any

7   appeals from Florida.

8           MR. BONEAU:  No, that's right, Your Honor.  The

9   appeal from Texas was actually filed in Florida against

10  American Airlines.

11          And then American won a forum non-battle to have

12  it sent to the Northern District of Texas, and so that one

13  got transferred into the Northern District of Texas.  But

14  that was the only other case in any District Court other

15  than the two cases that you have before yourself.  So that

16  is it.

17          THE COURT:  Okay.  Great.  Thank you.

18          MR. BONEAU:  Thank you.

19          Okay.  The other thing I would like to -- you

20  know, I know that we, that defendants talk a lot about it

21  and for reasons that make sense, the Court is focused on

22  some of the intricacies and nuances of the statute in

23  deciding these, the motions at hand and in discussing those

24  motions.  But I think it is important to realize that what

25  we have here is we have an individual -- the plaintiff isn't

some person who is completely attenuated from this property

in Cuba, that has no interest in it, that is, you know, as

my counterparty mentioned, three series of inheritances away

from the property.  This is an individual who played at this

property as a child, who has memories of this piece of

property that didn't have hotels on it.  It was just a piece

of beachfront property that his family -- or a series of

beachfront properties, I suppose, that his family owned

through generations that ultimately was taken from his

family by the Castro regime.

            And although at the time it was taken, his

mother and his aunt owned the property, it was a part of

his childhood.  It is a part of his childhood that he still

remembers to this day.

            So I wanted to make the point that this isn't

some many, many steps removed attenuated situation.  We

are really talking about an individual who remembers the

property and certainly feels the sense of loss as a result

of the property having been taken from his family.

            On the collateral estoppel issue, the Court

really asks, you know, what I would say are important

questions.

            In your normal situation for collateral

estoppel, the policy is a good one whereby you don't want

to -- and defendants I think cited to some of these cases,

1   you don't want a plaintiff to go lose a case and then file

2   the same case against the same defendants in an effort to,

3   quote-unquote, "have a rematch" wherein the same issues are

4   litigated again in an attempt to try to just get a different

5   outcome.  That is an inefficient use of judicial resources.

6   It's an efficient use of defense resources.  It is harassing.

7   Those are the types of things that collateral estoppel are

8   designed to protect against.  This is affirmably not this

9   case.

10          The Booking Agency case that is before Your

11  Honor was filed the same day as the American Airlines case

12  was filed.  And the credit card case that's before Your

13  Honor was filed a week or so afterwards.  So effectively all

14  of these cases were filed simultaneously.

15          The Northern District of Texas case was

16  decided first is just a matter of happenstance.  It's not a

17  situation where Mr. Glen went to the Northern District of

18  Texas and sued these defendants and lost and then decided

19  to go to Delaware to try to sue these defendants again in a

20  different jurisdiction in the hope that the Third Circuit

21  would look at it differently than what the Fifth Circuit

22  look at it as.  That is not what we have here.

23          So for that reason alone, this Court should make

24  its own determination particularly given when we're talking

25  about subject matter jurisdiction.

1            The Court in Texas didn't weigh all the facts on

2     the merits in this case.  The Court in Texas decided at the

3     outset that it didn't have subject matter jurisdiction so

4     it couldn't decide the case and then it did go on in dicta

5     to make some other findings that certainly are subject to

6     collateral estoppel.  And I don't think at least today that

7     the defendants even argued that they were.

8            And then in addition to -- I'm sorry.  Did you

9     have a question, Your Honor?

10           THE COURT:  Not yet, but go ahead.

11           MR. BONEAU:  Okay.  Sorry.  Yes.  So in

12    addition, under Third Circuit law, there is an exception

13    even whenever collateral -- the sort of elements of

14    collateral estoppels are met, there is still an exception.

15    If sort of the landscape of the law has changed or as Your

16    Honor pointed out, there is not a firmness to it.

17           And here, whenever the Northern District of

18    Texas case was decided against Mr. Glen, that was literally

19    the first case in the history of U.S. jurisprudence under

20    Helms-Burton to determine the standing, the Article III

21    standing issue.

22           Since then, every other court -- and admittedly

23    there is not a lot of them because these cases have only

24    been going on for a small period of time, but every other

25    court that has decided the issue has gone the other

1    direction, and has rejected either explicitly or implicitly

2    the Northern District of Texas's approach to the Article III

3    standing.

4              So given this is not a case where Mr. Glen is

5    not really taking a second bite at the Apple, that the

6    Northern District of Texas decision just happened to be

7    faster than the Delaware court's decision, and because the

8    landscape really has changed because when it was decided

9    there was no landscape when the Northern District of Texas

10   decided it, and subsequently there is at least some

11   landscape and all of that landscape has gone in the other

12   direction, it makes the most sense for this Court to go

13   ahead and make its own determination as to the Article III

14   standing and then subsequently the merits of the case versus

15   just relying on what the Northern District of Texas did.

16              THE COURT:  All right.  Now, I do have questions

17   on collateral estoppel.

18              MR. BONEAU:  Okay.

19              THE COURT:  Is that the situation I have here?

20   Do you concede that the four elements of collateral estoppel

21   are met?

22              MR. BONEAU:  I don't, Your Honor.  In

23   particular, the facts really are slightly different.  One

24   which is the largest fact that is different between the

25   two situations is that here, you have trafficking that

1    was -- that, as alleged, trafficking continued after the

2    notice letters were provided, except for possibly Visa who

3    at least has asserted that they pulled the plug on the

4    trafficking once they received the notice letter.

5            All the remaining defendants, none of them

6    have told us, and certainly we pleaded that they continued

7    to do the -- the conduct that we allege is trafficking, they

8    continued that after the notice letters.

9            In the American Airlines situation, the Court

10   held because -- so I should take a brief step back.

11           In American Airlines, there was a slight amount

12   of discovery done in Florida because the Court there, there

13   was a jurisdictional fight, personal jurisdiction fight

14   in Florida because American Airlines is incorporated in

15   Delaware and its present place of business is in Texas, and

16   plaintiffs alleged specific jurisdiction over them in

17   Florida.

18           So there was a jurisdictional fight and the

19   Court allowed for jurisdictional discovery.  And in the

20   process of jurisdictional discovery, plaintiff there

21   obtained information about what bookings occurred through

22   the American Airlines system.  And there were no bookings

23   that occurred after the notice letter was received.

24           So the Court in Texas determined that as a

25   result of no bookings having occurred, there was no

1       trafficking that occurred after the notice letter, that

2       that was part of the Court's decision and part of the facts

3       in that case.

4               Those aren't the facts in this case, and that

5       makes the two cases different.

6               THE COURT:  How about the injury?  I think

7       Mr. Duffy told us that you agree that the injury is the same

8       as in the American Airlines case.  Is that correct?

9               MR. BONEAU:  So with regards to the Booking

10      Agency case, the injuries are -- all of the injuries both

11      in the American Airlines case and in this case relate to

12      online booking agencies profiting from and allowing booking

13      at the hotels that were built on Mr. Glen's family's

14      property.  That is correct.

15              In the credit card case, that is a little bit

16      different.  That isn't about booking.  The trafficking there

17      is with regards to the use of the credit cards at the

18      subject hotels.  So I would say I agree with Mr. Duffy to

19      the extent we're talking about the booking agency case, but

20      I would disagree with regards to the credit cards because

21      that is really a separate issue.

22              THE COURT:  And with respect to collateral

23      estoppel, what the defendants I think today are saying is

24      perhaps the right course of action is that I just stay or,

25      you know, hold in abeyance these motions and see what the

Fifth Circuit decides.  Would that be prejudicial to your

client?  If so, how?  And are there any other reasons you

would oppose what the defendants are now suggesting?

MR. BONEAU:  I think the answer is, I don't

know that it would be prejudicial other than it would

further delay the ultimate resolution of these cases, which

we would prefer to move on and continue the process rather

than have this case stayed pending the Fifth Circuit.

The other issue is that just regardless of

what the Fifth Circuit says, I'm not sure what the Fifth

Circuit's decision is necessarily determines what this

Court should do and whether this Court should make its own

determination particularly if it is related to the Article

III standing issue.

Because as Your Honor noted earlier, regardless

of what happens with this case, the Eleventh Circuit

currently, unless it goes the other direction from what the

District Courts have there done, there is already in effect

a Circuit split on Article III standing.  There is no

meaningful differences between the analysis that the

American Airlines court did and what the Southern District

of Florida did.  In fact, the Southern District of Florida

just explicitly rejected the analysis that the Northern

District of Texas applied to the Article III standing issue.

So I say all that to say our preference would be

1    for Your Honor to reject the application of collateral

2    estoppel and decide the underlying motions.

3              But if Your Honor was inclined to apply

4    collateral estoppel, we would much prefer that you stay

5    the case -- or not necessarily the stay the case but hold

6    the decision in abeyance awaiting the Fifth Circuit because

7    we, as you would expect, we anticipate winning in the Fifth

8    Circuit.

9              And if we do, then we would -- if Your Honor

10   were to apply collateral estoppel and dismiss this based

11   upon a later reversed decision, then that would just

12   complicate things in the Third Circuit and sort of drag

13   things out in an unnecessary way for us to then come and

14   have to unwind what happened here in Delaware.

15             So that's a long story, a long way to say we

16   would prefer you to decide it unless you are going to decide

17   it against us, in which case we would wish you to hold it

18   abeyance.

19             THE COURT:  All right.  Got it.  You can move on

20   to whatever you want to address next.  Go ahead.

21             MR. BONEAU:  Okay.  I think that it makes sense

22   to talk about standing next.

23             The Court, the Third Circuit really, I think --

24   let me just say, I think that the real issue on standing

25   here that seems to be the two sides are viewing differently

1    is whether or not the injury in fact arises to the concrete

2    level as described by the Court in *Spokeo*.  Defendants

3    obviously say that it does not, and we say that it does.

4              Under Third Circuit law, there is really two

5    ways to get to concrete injury if what you are talking about

6    is an intangible injury.  As I'm sure the Court is aware,

7    intangible injury is a thing like economic law.  And those

8    are simple.  I think that Justice Alito in *Spokeo* mentioned

9    that is a pretty obvious way to get to standing.  But

10   whenever you have an intangible harm, you don't have a

11   direct economic harm as a result of whatever it is that is

12   being complained of.  That gets a little more complicated

13   and it takes a little more nuanced approach.

14             The Third Circuit has identified two means of

15   getting to that, identifying whenever you have a concrete

16   harm even though it is intangible.  That's the *In Re:*

17   *Horizon Healthcare Services* case which we cite in our

18   papers.

19             The first of those is, is the harm that is being

20   addressed something that has historically been a harm that

21   you can come to a court in England or America in order to

22   seek redress upon?

23             And in our view, what we have here is such a

24   harm because really what we're talking about is an unjust

25   enrichment type claim.  That Mr. Glen isn't bringing suit

1   against the defendants here because they have profited in

2   a way and made money that he should have been making.

3   That he should have been the one making the profit on the

4   commissions related to either the use of a credit card, or

5   the transaction fees that is associated with the use of a

6   credit card, or the commissions for booking and staying at

7   these hotel properties.  He is not saying that should have

8   been his money.

9             What he is really saying, and what it creates a

10  cause of action for is whenever the defendant profits off

11  the use of property that has been confiscated by the Cuban

12  government, then that is wrongful, and therefore a cause of

13  action lies for that, which is a very similar paradox which

14  you see for unjust enrichment claim, which is a claim that

15  has existed in our jurisprudence for many, many, many years.

16            The second test is did Congress create, elevate

17  a harm through statute that now gives rise, that maybe prior

18  wasn't such a concrete harm but now has become concrete harm

19  because Congress elevated it?

20            And the Court, the Third Circuit in *Horizon*

21  *Healthcare Services* goes to through a pretty extensive

22  discussion of that but effectively comes to the conclusion

23  that unless you are talking about a very procedural and

24  technical violation of a statute, if Congress went to the

25  trouble of creating a cause of action that lies with the

1    violation of a statute, unless the cause, the claims that

2    you are actually bringing are technical violations of that

3    statute, which I think Justice Alito in *Spokeo* references,

4    for example, if you have a statute related to the

5    distribution of false information but what was distributed

6    is an incorrect zip code, that is, it's hard to imagine why

7    that would give rise all the way to a concrete harm, a real

8    risk of injury, a real risk of harm.

9           But here that is not what we have.  Mr. Glen

10   hasn't asserted any those types of harm.  What Mr. Glen has

11   asserted is the exact substantive harm that Helms-Burton,

12   the Title III of Helms-Burton is attempting to address,

13   which is the trafficking of property that his family once

14   owned and was taken from him by the Cuban government, by the

15   defendants in this case.

16          And so in our view, both of the standing tests

17   are met that the Third Circuit has outlined and under

18   either, the injury, the claims that Mr. Glen asserts give

19   rise to an injury in fact.

20          THE COURT:  So the defendants say that you've

21   failed to point to any single tangible way that Mr. Glen's

22   circumstances would have changed had the defendants never

23   facilitated the bookings at the hotel.  Do you agree with

24   that or disagree?

25          MR. BONEAU:  I agree with that, but that ignores

```
 1    that there is an entire separate section.  Sure.  So that is

 2    that there is an entire separate section of types of harm

 3    that can arise to concrete that is just, that is described

 4    as intangible, which is where the types of harm that this

 5    case is about fall.

 6              These types of case doesn't follow.  It doesn't

 7    fall within intangible harm.  There is no economic harm to

 8    Mr. Glen because Expedia allowed someone to book on these

 9    hotels, and we haven't alleged that there is.

10              But there certainly are intangible harms here

11    that give rise to the level of concreteness that has been

12    described by both the Supreme Court and then subsequently by

13    the Third Circuit.

14              Unless Your Honor has more questions on

15    standing, I'd like to turn to the sort of the "acquire,"

16    the inheritance 1996 issue.

17              THE COURT:  That's fine.

18              MR. BONEAU:  Okay.  Your Honor mentioned a few

19    of the absurd results that we identified in our briefing,

20    all of which we think certainly mean that the defendants'

21    method of analyzing what the term "acquire" and what this

22    means in the context the entire statute must be wrong.

23              There is one more that I -- that Your Honor

24    didn't mention that I think is worth pointing out, which is

25    if a corporation is the entity that is the U.S. national
```

that held this, these claims as of 1995, that corporation
can hold these claims for the next 200 years and never die
and then bring these claims 200 years from now, assuming
that all of the other requirements are met.

And so although Mr. Duffy explained one of the
concerns with the way that plaintiffs are reading this is
that multiple generations from now someone might bring a
claim, that ignores the fact that that is exactly what could
happen for corporations because they, unlike humans, aren't
subject to the biological constraints that we are.

There is nothing in the statute, nothing in
the legislative history that would suggest that Congress
favored corporations bringing claims versus individuals
particularly.

And I'll turn over some of this discussion to
my colleague Mr. Dubbin, but particularly given that
85 percent of the certified claim holders are individuals
and not corporations.

The other issue on this concern that many, many
many, many, many years ago or years from now, someone might
be able to bring these claims kind of in perpetuity and that
is really what Congress was trying to address ignores the
fact that there is a limitation, there is a time limitation
in the statute under 6084 that you can only bring a claim if
the trafficking that you are complaining of has occurred

1    within the two years prior to you bringing the claim.   So

2    there is effectively a two year limitations period within

3    the statute itself.

4              So, for example, whenever Mr. Glen brought these

5    claims in 2019, any of these -- I'm sorry?

6              THE COURT:  You may have heard some background

7    interference.  It was not me, though.

8              MR. BONEAU:  Okay.  Sorry.  Yes.

9              So if any of these entities had ceased their

10    trafficking in 2016, they would have a defense.  That we

11    haven't been doing this within the last two years.  The

12    statute says you have to bring it within two years of

13    trafficking, you haven't done that, and so, therefore, you

14    know, we should be out.

15              So that concern isn't addressed by the statute,

16    and this 1996 issue is not how Congress was attempting to

17    address that issue.

18              So I would like to turn it over to my colleague

19    Mr. Dubbin who as a representative of Mr. Torricelli and

20    Mr. Burton has a particular insight as to what Congress's

21    view of this issue was and the enactment of the statute.

22              THE COURT:  Sorry.  I will have some questions

23    for him, but first for you, Mr. Boneau.

24              MR. BONEAU:  Yes.

25              THE COURT:  One of the defense arguments is if

1    "acquired" has the more limited meaning that you argue for,

2    they say Mr. Glen loses even under that scenario because he

3    doesn't have a claim.  There is no other way he could have

4    gotten it.  Respond to that argument.

5            MR. BONEAU:  Thank you.  I'm glad you brought

6    that argument up, Your Honor.

7            That argument assumes that this term "acquired"

8    really just means the word "had."  It includes -- it means

9    that Mr. Glen's mom and aunt had to have acquired the claims

10   in the past.  But it's a great example of why "acquired"

11   can't mean what they say it is.

12           Because Mr. Glen and Mr. Glen's mom and aunt and

13   all the other U.S. nationals and Cubans whose property was

14   expropriated during the Castro's regime, the revolution had

15   been 60 years ago, it doesn't make any linguistic sense that

16   they acquired a claim when their property was taken.  Just

17   like it wouldn't make any linguistic sense to say that a

18   company whose directors fraudulently misappropriated their

19   assets acquired a breach of fiduciary duty claim as a result.

20           The claim arose, they have the claim, but they

21   didn't acquire the claim.  You acquire a claim when you go

22   out into the market and you take assignment of a claim.  You

23   don't acquire a claim just because you have been harmed.

24           You say the claim arose, but you don't say that

25   you acquired it.  Just like you don't say that you acquired

1    -- I have brown hair.  I know you can't see it because we're

2    in the telephonic world that we're in now, but I wouldn't

3    say that at first I acquired brown hair.  I just have it.  I

4    had brown hair.

5              Mr. Glen's mom and aunt didn't acquire the

6    claims whenever the -- to this confiscated property.  They

7    just had them because the property was confiscated from

8    them.

9              Similarly, Mr. Glen didn't have to acquire the

10   claims because he didn't buy.  There was no transaction

11   whereby he transacted his mom or his aunt to acquire the

12   claim.  He now stand in their shoes because they unfortunately

13   passed and the claim has passed to him through inheritance.

14             But the term -- the use of the "term" acquired

15   in the way that defendants want to use it makes no sense if

16   they're saying that not only does Mr. -- does it not make

17   sense -- not only did Mr. Glen acquire the claim, he

18   inherited.  But if inheritance doesn't mean acquire, then he

19   must not have it because his mom and aunt acquired it back

20   in 1960.

21             THE COURT:  So do you point to any provision

22   in the Helms-Burton act that says someone in your client's

23   position has the claim or are we just supposed to know it

24   exists?

25             MR. BONEAU:  Well, so it's a fair point.  And

1    there isn't anything in Helms-Burton.  I can't point to

2    anything in Helms-Burton that makes it explicit that

3    inheritance is okay, but assignment isn't, or claims trading

4    isn't.

5           But the legislative history certainly, while

6    silent on inheritance, as Mr. Duffy referenced isn't silent

7    on what this particular provision was attempting to address,

8    which is claims trading after Helms-Burton was enacted.

9    That is what Congress -- I think Mr. Dubbin maybe is even

10   better suited to discuss this.  But that is what Congress

11   was attempting to address.  So it is unsurprising that

12   inheritance isn't discussed because Congress didn't, it

13   didn't occur that inheritance could be the thing that is

14   even being addressed or discussed as part of this term

15   "acquired."

16          The thing that people were concerned about was

17   claims trading, an assigning for value of these claims

18   after Helms-Burton got enacted.  So that is what is being

19   discussed.  Inheritance is discussed not because they just

20   assumed it was there but because they assumed it wasn't.

21          So unless Your Honor has more questions for me,

22   I think Mr. Dubbin might be better suited to discuss some of

23   these issues.

24          THE COURT:  Yes, I do have questions for you on

25   some of the other issues, but why don't we turn it over to

1    him now just briefly on the legislative history.

2                    MR. BONEAU:  Absolutely.

3                    THE COURT:  Mr. Dubbin, you can go ahead.

4                    MR. DUBBIN:  Sure.  Thank you very much, Your

5    Honor.  Sam Dubbin on behalf of Dan Burton and Robert

6    Torricelli.

7                    The lack of reference to inheritance in the

8    statute is a natural consequence of the fact that there is

9    no way in the world that Congress would have intended to

10   have a claims process for confiscations that occurred 30 to

11   35 years previously, where they also put in an opportunity

12   for the President to suspend the operability of that claim

13   for God knows how many years.

14                   And then what the stated purpose, and this is

15   stated in the legislative language itself, that the Title

16   III remedy is to allow U.S. nationals whose property was

17   confiscated by the Castro regime to receive compensation

18   as they would be under international law and to deter the

19   Castro regime from trafficking in that property.

20                   The idea that inheritance would be barred when

21   the claims may not, would not come into effect for at least

22   35 years from the original confiscation and then in terms of

23   24 years later makes absolutely no sense.

24                   THE COURT:  Yes.  Let me ask you a few

25   questions, Mr. Dubbin.

```
 1              MR. DUBBIN:  Sure.

 2              THE COURT:  You do agree that the legislative

 3    history as well as the statute are completely silent on

 4    inheritance; is that right?

 5              MR. DUBBIN:  On the concept of it.  On the word

 6    "inheritance," yes, but not the notion, Your Honor.

 7              THE COURT:  So where do I find reference to the

 8    notion of inheritance in either the legislative history or

 9    the statute?

10              MR. DUBBIN:  Because the fact that the rights

11    were acquired by individuals prior to March 12th, 1996, on

12    confiscations that occurred in the early '60s meant that

13    the likelihood was that they would -- that they could have

14    died before it would actually be able to be brought to the

15    Court.

16              And so it's implicit, and I'll address the

17    implicit right of heirs to bring claims like this separately

18    if Your Honor doesn't mind, but ... So my answer is it's

19    implicit in the framework of the statute.  I admit it

20    doesn't say inheritance anyplace, but it is implicit that

21    claims of this nature would be available to the heirs of the

22    people for whom the property was actually confiscated.

23              THE COURT:  Does any portion of your brief have

24    any specific reference to this "acquires" provision we're

25    talking about?
```

1          MR. DUBBIN:  Only in the sense that as I cite

2     the House Committee Report referencing both (a)(4)(B) and

3     (a)(4)(C) as being intended to eliminate any incentive that

4     might otherwise exist to transfer claims to confiscated

5     properties in order to take advantage of the remedy.

6          THE COURT:  Is there a part that says it is in

7     part designed for that?

8          MR. DUBBIN:  Yes, intended in part to eliminate

9     any incentive that might otherwise exist to transfer claims

10    to confiscate a property to U.S. nationals, to take

11    advantage of the remedy.  I wouldn't read into that the

12    intent to disallow people to inherit the claims because as

13    Your Honor pointed out, the literal reading that the

14    defendants give to their interpretation, when you look at

15    subsection C, it says:  In the case of property confiscated

16    on or after March 12th, 1996, the United States national,

17    who, after the property is confiscated, acquires ownership

18    of a claim to the property by assignment for value may not

19    bring an action on the claim under this section.

20         But under the liberal reading, that person could

21    bring a claim if he inherited it because it only precludes

22    the bringing of a claim by someone who acquired it by

23    assignment for value.

24         THE COURT:  I understood Mr. Duffy to disagree

25    and to say that that was not his position, but I

1   understand --

2            MR. DUBBIN:  But he can't just state the fact

3   that that is what the literal language says.  So if literal

4   language applies to (B), it should apply to (C).

5            THE COURT:  You have a lot of arguments, and the

6   plaintiff, too, about the defendant's interpretation would

7   render the law meaningless or, you know, it is inconsistent

8   with the broad remedial purpose of the statute to come

9   out the way the defendants want, but at the same time, of

10  course, Congress put in the ability of the President to

11  suspend Title III private rights of action apparently

12  indefinitely but certainly in six month increments.  It

13  ended up being 20 plus years.

14           Why couldn't this same argument about render it

15  meaningless be made, you know, about that provision, but we

16  know Congress put that provision in, so I guess isn't there

17  a real tension in what you're arguing?

18           MR. DUBBIN:  No.  Excuse me, Your Honor.  No,

19  that is actually consistent with my argument.  Because

20  Congress understood that the right to sue may not come

21  into reality for some period of time, whether it was six

22  months only or several increments of six months.  But

23  they certainly understood that when the time came, when a

24  President decided to that Cuba was not going to become

25  democratic and that it was no longer acceptable in whatever

1      diplomatic efforts were being made to bring in a democracy,

2      that the time for remedy would be brought into effect,

3      that that remedy should be effective and that it should (A),

4      provide compensation to U.S. nationals whose property has

5      been confiscated and (B), be a disincentive to local

6      corporations to traffic in confiscated property.

7              I believe that is consistent, Your Honor.

8              THE COURT:  Isn't there --

9              MR. DUBBIN:  That is exactly what happened.  It

10     took 24 years before the remedy was activated.

11             THE COURT:  It seemed from like a lot of what

12     you quoted as the legislative history that what the main

13     concern of at least the legislators feel you quoted was a

14     third party or with a third nation coming in and buying

15     things like the subject property, you know, directly from

16     the Cuban government or representatives from the Cuban

17     government and propping up the Castro regime through that

18     type of direct cash infusion.  It just seems like a lot of

19     it wasn't concerned with the, I don't know, I suppose the

20     more tangential type of allegation here.

21             Is that an incorrect reading of the portions

22     that you have highlighted for me?

23             MR. DUBBIN:  Yes, Your Honor.  I mean, they're

24     at least co-equal purposes.  And the one is stated in

25     Section 608(1), the actual Congressional findings.  The

1    individuals have a right to enjoy property which is

2    described in the United States Constitution.  The wrongful

3    confiscation or taking of property belonging to United

4    States nationals by the Cuban government, the subsequent

5    exploitation of this property at the expense of the rightful

6    owner undermines the comity of nations, the free flow of

7    commerce and economic development, and therefore it goes

8    back.

9              And it continues to go into it's in the

10   interest of Cuban people that the Cuban government respect

11   the property rights of Cuban nationals and that the

12   trafficking and confiscated property provides designated

13   currency to the Cuban government, and that the purpose of

14   the law is to protect the claims of United States nationals

15   who had property wrongfully confiscated by the Cuban

16   government.

17             Those are coequal purposes, Your Honor.  And

18   they're both outlined in Section 608(1).  And I guess I'd

19   have to go back and re-read the excerpts that I quoted, but

20   I would -- I would not say that there was a balance to the

21   points you made rather than compensation to the individual.

22   And the article by Senator Helms's staff director that I

23   quote in the brief as well, you know, points that out.

24   That Senator Helms was uniquely interested in the lack of

25   international legal opportunities for restitution of

1     confiscated property.  And that was why he felt that this

2     exception was always necessary.

3                 THE COURT:  All right.  I am going to have a few

4     more questions for Mr. Boneau, but --

5                 MR. DUBBIN:  Could I?  Would you mind?  I have

6     one other point I'd like to make, if Your Honor would

7     indulge me.

8                 Because I was brought this question about, you

9     know, how do we make sure that heirs are allowed to bring

10    these claims when you have an ambiguity in the statute?

11                My experience, you know, as an attorney, I've

12    been representing the Holocaust community for over 20

13    years seeking restitution of the looted assets.  And in

14    every single one of those cases, it is implicit in the

15    restitutionary scheme that heirs are entitled to assert

16    the property rights of their parents and grandparents

17    because of the passage of time since the original violation

18    of international law, the original confiscation.

19                I've litigated the Hungarian Gold Train case in

20    the Southern District of Florida, *Rosner vs. United States*

21    *of America*.  That was a case where the Hungarians and Nazis

22    had confiscated the Jews property.  It was put on a train.

23    The train was headed for wherever Hitler thought he was

24    going to retire when the war ended.  The Hungarians handed

25    the train over to the United States Army who do not handle

the property in conformity with U.S. and international law,

and the U.S. classified that information for 50 years and it

was brought out in a Presidential Report in 1999.

So we filed that case against the United States

for a breach of implied contract for bailment.  And the

judge, Judge Seitz in that case, made it clear the U.S.

Government who asserted every single argument you can

imagine against the plaintiffs never argues that the

plaintiffs themselves did not have the same rights as their

parents in the property, that they were teenagers at the

time it was confiscated.

There was another reported case called *Bodner v.*

*Banque Paribas* where the Holocaust survivors sued the French

banks for having, you know, confiscated -- participated in

the confiscation of their parents' bank accounts.  And in

that case, and, of course, that case was brought in the year

2000, even though the confiscations took place during the

Holocaust over 50 years previously.

In that case, the defendants actually did argue

that the survivors, the plaintiffs had no legal basis to

bring the claims which had not accrued to them but it

accrued to their parents, and the Court rejected that and

said many of the relatives of the named plaintiffs died in

the concentration camps in Europe during the Holocaust.

They had resided in France before their detention in the

1    concentration camps.  And under French law, Title 2, in

2    light of possession of all assets, the intestate decedents

3    vested immediately in the descendants' legatees.  Upon the

4    deaths, the descendants' property passes immediately to

5    those entitled without passing through the intermediary of

6    an estate.  Courts are involved only in the event of adverse

7    litigation.  Thus, plaintiffs who was parents died in Nazi

8    concentration camps may properly bring this action in their

9    own names.

10               So when you have -- and there was, there was a

11   third case, if I could raise it, Your Honor, because it's

12   also one that I was involved with.  And that is under the

13   Social Security Act, there is a federal statute that says

14   that payments made by the Nazi regime to individuals because

15   of their status as victims of Nazi persecution shall be

16   disregarded in determining eligibility for the amount of

17   benefits for services to be provided under federal law or

18   under federally assisted programs which provides benefits

19   of services based in whole or in part on need.

20               So there was gentleman in New York whose parents

21   were both survivors.  They had received compensation from

22   the German government which they put into a trust, and when

23   they died the trust was inherited by this individual.

24               The Social Security Administration took the

25   position that because he wasn't the recipient of the

 1   payments himself that those -- that corpus was to be

 2   included in his list of assets so that he was then denied

 3   the SSI benefits and he was actually an indigent individual.

 4          We brought that case -- so we appealed that case

 5   to the Administrative Law Judge who reversed what the legal

 6   office, SSA wanted to say, wanted to do and he wrote:

 7   Principles of statutory construction, federal agency

 8   interpretation and case law, and the Doctrine of

 9   International Comity all support the continuation of the

10   resources of restitution clause after the death of the

11   recipient to the immediate heirs.

12          To construe the exemption in favor of the

13   immediate heirs is to be consistent with the intent of the

14   act which sought to further the German government's purpose

15   in making restitution payments to victims of Nazi

16   persecution, to redress the damage done to the persons they

17   persecuted and the damage that the devastating and permanent

18   consequences of the Nazi's persecution inflicted on their

19   families as well.

20          And in making that analysis, Your Honor, the

21   Administrative Law Judge cited *Grunfeder vs. Heckler*, 748

22   F2d 503, Second Circuit case, where the SSA had previously

23   tried to deny heirs the benefit of reparations payments made

24   to the parents, and the Court said no.  The reason Germany

25   made those payments had a restitutionary purpose.  It wasn't

1   to just give people a basic amount of money to live on.  It

2   was to say you need to be compensated for the harms that

3   were caused.

4              And so I am suggesting to Your Honor that the

5   same restitutory purpose with the Helms-Burton Act has

6   implicit in it that -- and it would also be assumed by the

7   Congress that these would be able to be inherited.  That the

8   March 12th, 1996 date is not some "arbitration date that

9   Congress picked in order to stop, to have a limit to claims"

10  but it was the date, the date the law was passed, and they

11  didn't want to have commercialization of claims after, you

12  know, they were, you know, acquired prior to that date.

13             There was certainly nothing about blocking

14  inheritance that makes any sense under law.

15             THE COURT:  All right.  Thank you.

16             Mr. Boneau, I want to use the remaining time

17  for your side to ask you a few questions on some of these

18  other issues, some of which we might have touched on, but

19  on scienter, if I were to agree with the defendant's

20  interpretation of what the statute requires, would that

21  mean that your client are limited only to trafficking that

22  occurred after you provided the pre-suit notice to each

23  defendant?

24             MR. BONEAU:  I would say no, Your Honor.  I

25  think that if you were to go with defendants' view of the

world, that this scienter becomes easier to establish after

they received the notice letter and they continued to do the

trafficking.

           But as we outlined in our brief, we still

believe that even if they're right, they still should have

known, if they did not know, that the property that they

were dealing with was confiscated because President Clinton

put everyone on notice in 1996.  And there is --

           THE COURT:  Let me stop you.  Yes, hold on.

Don't those arguments risk transforming this into a strict

liability statute in eliminating scienter requirement

essentially?

           MR. BONEAU:  No, Your Honor.  Because there are

certainly ways in which a potential commercial actor could

end up having profited from commercial activity in Cuba but

not knowingly do so and not intentionally do so.

           An example would be if -- you know, many of the

hotels are Spanish hotels because of the connection between

Cuba and Spain.  So a towel manufacturer from Spain might

make towels and sell them to a distributor in Spain that

in turn sells the towels that it distributes to Melia in

Spain, and then the Melia hotel chain may distribute those

towels to its hotels everywhere, including in Cuba.

           In that situation, the towel manufacturer,

despite the fact that if you trace the steps far enough, the

1    profit that it made on the sale of its towels is tied to the

2    fact that that towel is sitting in a hotel in Cuba and being

3    used by people staying in that hotel.

4              THE COURT:  Right.  But --

5              MR. BONEAU:  That towel manufacturer --

6              THE COURT:  On your view of the statute, that

7    towel manufacturer, if they know and intend that some of

8    their towels will end up being in Cuba regardless of where

9    in Cuba, what property, et cetera, they're liable; right?

10             MR. BONEAU:  Assuming that they know and intend

11   that their towels are going to be used at hotels of

12   properties in Cuba, I think that is correct.

13             THE COURT:  Even if it turns out that the

14   property that the hotels in Cuba is on was not confiscated.

15             MR. BONEAU:  Oh, no.  Then there would be no

16   liability because there would be no underlying claim.

17             THE COURT:  You would satisfy the scienter

18   element but no underlying claim, I guess.

19             MR. BONEAU:  Correct.

20             THE COURT:  All right.  On the residential use,

21   there is, you know, some back and forth on this in the

22   briefing.

23             If the facts were to show that somebody

24   actually does live right now at one of these hotels, you

25   know, they're a long term resident or, you know, there is

1       one condo in the building or the manager lives there

2       permanently, what would that do to the dispute here?

3                   MR. BONEAU:  Well, that is an interesting

4       question.

5                   I don't think that it should change anything.

6       I think that what the residential exception was really

7       attempting to address was people who live at a place in Cuba

8       that was confiscated, you know, 60 years ago and now it

9       houses, this is an apartment complex that houses just Cuban

10      citizens, and those citizens are provided services.  They

11      have cable, they have Wi-Fi or they have, you know, whatever

12      the services that are being provided and those services are

13      ultimately provided by a third-party that exists outside of

14      Cuba, a Spanish company of some sort.

15                  That that company shouldn't be sued for

16      providing services to Cuban citizens because the efforts

17      of Helms-Burton weren't to prohibit Cuban citizens from

18      receiving services or products.  It was really addressing

19      commercial activity that was leading to the propping up of

20      the Castro regime.

21                  So a hotel whose main purpose is to be a hotel,

22      that also has condos, that shouldn't entirely erase the fact

23      that the claims that we're talking about are not about sells

24      of condos to Cuban citizens.  The claims that we're talking

25      about are reserving rooms at a hotel in Cuba or using a

1    credit card at a hotel in Cuba, but regardless we certainly

2    have pleaded and I don't think the plaintiffs have raised

3    the potential that there are condos on these properties.

4         And so certainly at this stage, there is nothing

5    in the record that would suggest that that particular issue

6    is really before the Court.

7         THE COURT:  Okay.  On --

8         MR. BONEAU:  Although it is.

9         THE COURT:  Right.  On the lawful travel

10   exception, at least some of the defendants argue that if the

11   burden is placed on them, it is then an impossible burden to

12   meet what makes for lawful travel is very complicated, a lot

13   of factors when you are traveling to Cuba, and they will

14   not have access to that information on everyone who books

15   something through their services or using their credit cards

16   or whatever.  Therefore, that may transform this into

17   something akin to a strict liability statute.

18        Address that argument.

19        MR. BONEAU:  So I don't know that that is true,

20   first of all.  In order to travel to Cuba, my understanding

21   is there is a checklist that one has to go through,

22   particularly if you are coming from the U.S., where you have

23   to identify why you are going there, why is it okay to do

24   so.  And these travel companies whether they collect that

25   information and keep it or they don't, they certainly have

1    the information related to who it was that used either

2    their credit cards or who it was that made the bookings

3    though their website, through their -- to the subject

4    hotels.  And so whether or not they currently own it, which

5    they may, that doesn't mean that that is the end of the

6    inquiry.  If in fact it's an affirmative defense, they have

7    to go get the evidence that they need to prove their

8    affirmative defense.  They have to go get it from the people

9    who they have the information from who those people are if

10   they don't currently have it.

11           But really the lawful travel defense doesn't

12   stop at a lawful travel, Right?  The term "necessary" is

13   there.  So I just want to -- I know it is not really what

14   Your Honor asked, but I just want to point out that

15   regardless of whether or not they establish what happened

16   was lawful, they can't establish that what they are doing is

17   necessary as the Third Circuit has interpreted it.  And in

18   fact, the way that Expedia in particular identified this in

19   their brief, they effectively -- if I can -- if you give me

20   a moment to get the actual language?

21           The language of the "lawful travel exception"

22   says:  "Transaction and uses of property into the lawful

23   travel in Cuba, to the extent that such transactions and

24   uses of property are necessary to the conduct of such

25   travel."

1          So it's incident to travel, lawful travel to

2     Cuba, and then necessary to such travel.

3          And Expedia in its brief basically -- and not

4     basically, it explicitly says, "Necessary and incident to

5     means related to," meaning that the second cause of that

6     sentence is irrelevant if in fact related to.  Because

7     otherwise you just -- the cause just says travel or, you

8     know, uses of property that is related to travel, to the

9     extent that it is related to travel.

10          So that can't be what it means.  Necessary

11     means what the Third Circuit says it means which is

12     required.  And it is not required that any of the services

13     that are provided by any of these defendants be used in

14     order to travel to Cuba.

15          For the booking agencies, you could use Expedia

16     or you could use Hotels.Com or you could use Travelocity or

17     you could use any one of these defendants but not all of

18     them, or you could just go straight to the hotels and book

19     your reservation.  You certainly don't -- it's not needed

20     that any one of them provide the services that they provide.

21          Similarly, for the credit cards, you could use a

22     MasterCard, you could use Visa, or you could use neither and

23     just pay cash.

24          There are multiple alternatives to do what you

25     need to do.

1          And, finally, there is no need that you stay at

2    these particular hotels when you are Cuba.  You can stay at

3    many hotels, whether it be at Varadero, or Havana or

4    anywhere else in Cuba.

5          So although the lawful travel portion of that

6    phrase could potentially called an evidentiary headache for

7    defendant, it's sort of beside the point because they can't

8    prove, they'll never be able to prove what is necessary, so

9    a travel exception is not going to apply.

10          THE COURT:  All right.  Then on the election of

11    remedies point, if I were to permit another amendment to

12    the complaint, can you, of course, consistent with your

13    obligations under Rule 11, can you plead in greater

14    specificity exactly how these properties are not the

15    properties that were at issue in that earlier case?

16          MR. BONEAU:  We can.  There are different

17    properties.  I don't view our pleadings that they're

18    different properties as conclusory, it's just a simple

19    statement.  They're different properties.

20          It's like saying they're different cars.

21    They're just, they're different pieces of land, the hotels

22    are different hotels.  But to the extent that Your Honor

23    would like more detail or a map or a picture or something

24    that more explicitly sort of supports the statement that

25    they are different hotels, we would be more than happy to

1    do that on amendment.

2             THE COURT:  Okay.  Thank you very much.  I gave

3    plaintiff about five extra minutes, and we'll add five

4    minutes to the defendants' time, and we'll turn it back to

5    them at this point.

6             MR. BONEAU:  Thank you, Your Honor.

7             MR. SHANK:  Good afternoon, Your Honor.  This is

8    David Shank representing the Expedia entities.

9             There are three very strong reasons for

10   dismissal that you have heard today.  All of them stand on

11   their own feet, and nothing that plaintiffs have said

12   undermines any of them.

13            No. 1.  The decision in Glen v AA precludes Glen

14   from relitigating standing in this case, and that precludes

15   them from maintaining this action.

16            No. 2.  Even if Glen had not already litigated

17   and lost the very standing argument he makes here, he hasn't

18   suffered injury in fact caused by the defendants alleged

19   conduct and he doesn't have standing.

20            And, third.  Even if Glen could demonstrate

21   standing, his actions still fail as a matter of law for

22   multiple reasons, but most notably which is he did not

23   acquire ownership of the properties before March 12th, 1996.

24            I'd like to start by responding to some of the

25   arguments that plaintiff's counsel made about a claim for

1    issue preclusion.

2              The standing issue in this case is exactly the

3    same as a standing issue that Mr. Glen litigated against

4    American Airlines in the Northern District of Texas.  The

5    conduct is the same.

6              Importantly, the American Airlines case is not

7    about offering flights.  Your Honor asked a question about

8    that at the beginning.  It has nothing to do with operating

9    flights.  It is about the fact that the American Airlines

10   website, when someone is on there booking flights, offers

11   the opportunity to book hotels.  And, in fact, it does it

12   through one of the entities of the defendants here, I

13   believe.

14             So that case is exactly the same as the OTA or

15   Online Travel Agency case here.  It is about booking hotels

16   that Mr. Glen alleges stand on property that his mother and

17   his aunt allegedly owned at the time it was confiscated.

18   This is the same case.

19             The cases in Florida are not the same case.

20   They are distinguishable.

21             Now, plaintiff's counsel said that those cases

22   disagreed with the analysis in American Airlines v Glen.

23   That is not correct.

24             The *Havana Docks* case, for instance, expressly

25   distinguished Mr. Glen's standing argument from the argument

1    that was being made in that case, and they distinguished

2    the argument on a very notable basis, which is that Mr. Glen

3    never owned these properties, and, therefore, he does not

4    argue that his injury stems from the confiscation of the

5    properties.  He admits that in his brief.

6            The *Havana Docks* case, the plaintiff there owns

7    the properties at the time of confiscation, and it was on

8    that basis that the Court in *Havana Docks* distinguished

9    Glen.

10           So there is no uncertainty in the law that would

11   justify declining to follow collateral estoppel in this

12   case.  There is no conflict in the law.

13           Now, what there is is a pending appeal, as Your

14   Honor noted.  And Your Honor does have the discretion to

15   decide to wait to see how that pending appeal comes out in

16   order to avoid what would be a procedural morass if the

17   Fifth Circuit did reverse, which we don't think is likely,

18   but then we had to fix the judgment here because of that

19   reversal.

20           So, Your Honor does have the discretion to

21   stay this matter and wait for the Fifth Circuit to we think

22   affirm the judgment below.  But there has not been this

23   ambiguity in the state of the law on this issue, which is

24   whether Robert Glen has suffered an injury in fact as a

25   result of the conduct of defendants who transacted with

1    these hotels in one way or the other.

2           I also want to respond to plaintiff's argument

3    about the various cases that were filed around the country,

4    because this issue that plaintiff complains about is really

5    a problem of their own creation.

6           It is true that there were a number of matters

7    that were filed against different Expedia entities.  And we

8    agreed for those to be consolidated in Delaware, and that is

9    not the basis of our argument here.

10          But it is equally true that plaintiff

11   intentionally, even if you put all the online travel cases

12   together as they are today, plaintiff intentionally filed

13   three separate actions across two different courts even

14   though there is no dispute that every single defendant or

15   the defendant in the Texas action and the defendants here

16   are either subject to personal jurisdiction in Delaware

17   because they're Delaware corporations or conceded to that

18   jurisdiction.

19          But for whatever reason, the plaintiff wanted

20   to take a shot at getting one of these cases in Miami and

21   didn't want to plead the Visa/MasterCard case in the same

22   cases as the online travel agencies.  And, you know, maybe

23   that wasn't because plaintiff wanted to try and see if he

24   could get several bites at the apple and see which court was

25   going to be more favorable, but it is still a problem of his

1      own creation, and he cannot now complain to the Court and

2      say, well, this really doesn't serve the purposes of

3      collateral estoppel because this is really his fault.

4              One other point I wanted to bring up on

5      collateral estoppel is the argument that there are different

6      allegations about scienter between the American Airlines

7      case and these cases, but that has no bearing on whether the

8      standing issue here was already decided in American Airlines

9      because the scienter question has nothing to do with

10     standing.

11             The standing question is quite straightforward.

12     It is simply:  Was Glen injured in some concrete way as a

13     result of the defendants' conduct?  And that has nothing to

14     do with whether or not the conduct was immediately ceased

15     after receiving the demand letter or not.

16             So the second reason for dismissal.  Even if

17     Your Honor were not inclined to either dismiss the case

18     based on collateral estoppel or at least stay it until the

19     Fifth Circuit rules is that even an independent analysis

20     of standing reveals that Mr. Glen just does not have any

21     standing here.

22             There is no statutory case, there is no case law

23     supporting the idea that an injury in fact can be inherited.

24     Injury in fact required must be concrete and it must be

25     particularized to the plaintiff.

1              So I think Mr. Duffy used example of a watch.

2    If my father, before he passed away, had a watch stolen, I

3    don't now have some claim against the person who stole it or

4    the fence who sold it to the ultimate buyer or the pawn shop

5    because it's not my injury.  The confiscation is not Glen's

6    injury.  And, in fact, he admits that.

7              Nor is the emotional sense of loss he may feel

8    related to the property a concrete injury under well

9    established law.  Even if he was at the property, even if

10   he has fond memories of it, the undisputed fact is he never

11   owned it.  He was never the owner of the property.

12             Now, Glen admits now that he has no tangible

13   injury, and so plaintiff's counsel made reference to cases

14   involving intangible injury and then skipped right to the

15   two different inquiries that the Third Circuit engages in

16   with intangible hard cases.

17             But what plaintiff's counsel skipped over was

18   in those cases, the plaintiff still has to identify an

19   intangible harm that is separate and apart from the mere

20   statutory violation, and he has not done so.

21             I think the most recent case on standing from

22   the Third Circuit just came out on November 20th.  It's

23   called *Thorne v Pep Boys*, and it is Case No. 20-1540.  And

24   that is a case that dealt with intangible harm.  And the

25   Third Circuit went through and applied those two prongs, but

1     importantly it applied those prongs in assessing an

2     articulated intangible injury.

3          There, the injury was the risk that the

4     plaintiff might not be informed of a recall of her tires

5     because Pep Boys did not register her tires correctly.

6          Now, the Third Circuit found that insufficient

7     but it could at least engage in the analysis because there

8     was an intangible harm identified that was separate from the

9     actual legal cause of injury.

10          Here, there is no such intangible harm.

11          So the statement remains true that Mr. Glen's

12     circumstances, both tangible and intangible, would be exactly

13     the same as they are today had the defendants -- had the

14     Booking and Expedia defendants never offered reservations at

15     the hotel and had MasterCard and Visa never offered pen and

16     processing services related to the hotel.  He would still not

17     own the property.  He would still have no right to proceeds

18     from the property, and there would still be hotels sitting on

19     the property.  Nothing tangible or intangible would have

20     changed, and that is the basis of standing.

21          His argument is purely that Congress created

22     what he describes as a substantive cause of action or a

23     substantive right and the defendants have violated that

24     right, but that is not enough.  And the best example is

25     the Supreme Court's recent case in *Thole*.  There, there can

1   be no dispute.  Congress expressly granted the plaintiffs

2   there a cause of action, and the Supreme Court says that

3   does not matter.  The cause of action is irrelevant to

4   standing analysis.

5          And that makes sense because standing is a

6   constitutional requirement and Congress cannot just brush it

7   aside by granting a cause of action to someone who does not

8   have a concrete injury.

9          So even if there is no issue preclusion or Your

10  Honor were to find preclusion issue here, there is no

11  standing and the Court lacks subject matter jurisdiction and

12  the case can be dismissed on that basis.

13         The last point has to do the legal merits of

14  these claims, 12(b)(6).  And, again, the clearest one here

15  is the date of acquisition bar.

16         There is no statutory case, there is no case

17  based on the language of the statute for accepting

18  inheritance from the date of acquisition requirement.  The

19  plain meaning requires acquisition by March 1996.  And

20  "acquisition" simply means "to get."  You must get the claim

21  before 1996.

22         Now, plaintiff's counsel suggests that that

23  doesn't make sense for someone who owns the property at

24  the time of confiscation.  But I fail to see why that is

25  the case.  I think someone who owns property when it is

1    confiscated, the moment it is confiscated they acquire, they

2    get, they obtain a claim to that property.

3                So I think his mother and his aunt, to the

4    extent they had claims to property, they acquired those the

5    date of the confiscation.

6                Their interpretation is also self-defeating,

7    as Your Honor pointed out.  If the word "acquire" doesn't

8    include inheritance, then Mr. Glen never acquired a claim at

9    all, and therefore he is not a United States national who

10   owns the claim to the property.

11               The absurd result argument, which I think was

12   one of the first issues Your Honor brought up, the absurd

13   result doctrine imposes an extremely high bar that Glen has

14   not even attempted to reach here.

15               As long as there is any conceivable

16   justification for the plain meaning of the statute, it is

17   not an absurd result, and the absurd result doctrine cannot

18   brush aside the words chosen by Congress.

19               Here, there are multiple conceivably

20   justifications for the date of acquisition bar.  I mean

21   Congress simply said, all right, as of the date we are

22   enacting the statute, we are only granting a cause of action

23   to the people who own the claims today.  We were talking

24   about prior confiscations.

25               The people who own the claims today, you get the

1    cause of action.   There will be no more subsequent

2    transfers, whether for value or otherwise.

3              One of the great justifications for this is

4    judicial economy, and that would avoid exactly the type of

5    issues that we would have to wade into if this case were to

6    proceed beyond the pleadings.

7              Which is, how does someone inherit a claim to

8    property?

9              What is a claim to property?

10             Is it a real estate interest?

11             Is it a piece of personal property?

12             If it is real estate interest, how do we avoid

13   the usual rule that rights in real estate are determined by

14   the law of the jurisdiction where the real estate exists?

15             If it's personal property, how do we avoid the

16   rule that usually if you inherit a cause of action, there

17   are rules for how the trustee of an estate or administrator

18   of an estate must assert that action?

19             So we avoided, Congress avoided all of those

20   problems by simply saying we're going to freeze it as of

21   today.   Whoever owns the claims today, they get to assert

22   them, and there will be no subsequent transfers.

23             The other purpose is to prevent the type of market

24   for claims that plaintiffs talked about.   But Congress very

25   well may have thought, hey, there are a lot of very expensive

1   and clever asset protection lawyers and transaction lawyers

2   who have come up with all sorts of devices for purporting to

3   transfer a claim that is technically not an exchange of value

4   but in reality really is.

5          Congress simply made a choice, that choice was

6   clear, and that choice precludes them from having a claim in

7   this case.

8          As for the Holocaust-related cases that amici

9   counsel talked about, they simply have nothing to do with

10  the Helms-Burton act.  They simply don't involve a statutory

11  provision that Congress expressly granted to bar claims that

12  were not acquired by certain date.  They also have nothing

13  to do with French law.

14         Here, we have a clear statutory bar.  It has

15  conceivable purposes and, therefore, it must be applied as

16  written.

17         Glen may think that that provision, the

18  application of that provision is unfair, that it's bad

19  policy, and he may -- maybe he is right.  We don't think he

20  is, but, you know, we can disagree on issues of policy.  But

21  he just can't simply tell the Court he doesn't like the

22  outcome and ask the Court to rewrite the statute, and that

23  is exactly what he is asking the Court to do.

24         And that is also exactly what the amici are

25  asking the Court to do.  They are two former Congressmen.

1    Two of, you know, hundreds of people who write the laws of

2    this country.  And while their service is admirable, their

3    opinions today on what a law that was passed by all of

4    Congress back in 1996 means are completely irrelevant to the

5    Court's analysis, especially when there is unambiguous

6    language, where the statute is unambiguous in its application.

7                 Two other quick points on the merits involve the

8    scienter requirements and the residential use exception.

9                 On scienter, unsubstantiated allegations from

10   plaintiff's counsel in a demand simply cannot put everyone

11   on -- whoever receives such a notice on notice and render

12   their prior conduct knowing and intentional as a piece of

13   property.  Nor can it render their continuing conduct

14   knowing and intentional because they're just unsubstantiated

15   statements by a lawyer.  Were it otherwise, the scienter

16   requirement would be written out of the statute.

17                 You have the same problem with this idea that,

18   well, if the defendants didn't immediately stop what they

19   were doing upon receiving the notice, then that means their

20   post-notice conduct is knowing and intentional.

21                 Well, not all conduct can be ceased immediately

22   anyways, and the defendants may have knowledge specifically

23   that properties are not confiscated, and they have very good

24   reason for continuing their conduct, but to allow just the

25   giving of a notice letter to satisfy the scienter requirement

1    would write it out of the statute.

2              On the residential use exception, the time of

3    confiscation is what matters, not the current time.  This

4    is not intended to protect Cuban nationals who currently

5    live on these properties.  And we know that because there

6    is an entirely different exception in the uncertain doctrine

7    that clearly protects those people, and that is in the

8    definition of "traffics."  The definition of "traffics"

9    excludes from the definition of traffics transactions and

10   uses of property by a person who is a citizen of Cuba and

11   resident of Cuban.

12             That is the provision by which Congress decided

13   to protect innocent Cuban nationals who are currently living

14   in property or currently using property from being subject

15   to these suits, and therefore it cannot also be the same

16   purpose that underlies the residential use exception.

17             The residential use exception was meant again as

18   a limit on the number of suits and really type of suits that

19   are brought under the statute.  Because just as we're seeing

20   in this case, suits based on small pieces of residential

21   property require a lot of effort by the Court, require a lot

22   of factual inquiries that are going to be complicated and

23   frankly fuzzy, and the value of those cases likely is not

24   going to justify that type of effort, at least that was

25   Congress's judgment.

1              THE COURT:  All right.  Let me ask you some

2    questions.  Let's start with where you finished on the

3    residential use.

4              I'm looking at I guess little Romanette 4, which

5    is what you just pointed me to as protecting Cuban nationals

6    who may be in residences now.  We're in the same place.

7              MR. SHANK:  Yes.

8              THE COURT:  (B)(iv).  Let's assume for the

9    moment that the hotels in question here were apartment

10   buildings and filled with Cuban citizens who are not

11   officials to the Cuban government or the ruling political

12   party.  Just help me understand how this provision would

13   carve out of trafficking, you know, defendants' activities

14   like the ones here, if you could somehow do them in

15   connection with an apartment.

16             MR. SHANK:  That exception, Your Honor, would

17   not carve out the activities of the defendants here.  What

18   it would carve out and prevent would be suits against those

19   Cuban nationals because they otherwise would be using the

20   property and therefore under the statute trafficking in the

21   property.

22             And so that is what that exception is meant to

23   do is to protect the nationals.  It's not -- it would not

24   protect the defendants.  And that, in fact, is what

25   proves that the residential use exception has a different

```
 1    application, different purpose, and different scope, which
 2    does include incidentally in this case exempting the
 3    defendants conduct.
 4              But really what it is exempting the plaintiff's
 5    -- the property underlying the plaintiff's claim.  It is
 6    just saying we're not going to mess with residential
 7    properties.  That just doesn't rise to the level that we're
 8    willing to commit the resources of the United States Courts
 9    to handle those claims.
10              THE COURT:  All right.  Talk, if you would,
11    about the unjust enrichment analogy.  The plaintiff says
12    that there is a historical parallel there that answers some
13    of your arguments about injury here.
14              MR. SHANK:  Yes, Your Honor.  So two points on
15    that.
16              No. 1.  As I already stated, we don't even get
17    there unless the plaintiff actually identifies an intangible
18    harm to be evaluated.  So in order to see if Congress
19    intended to elevate or, I'm sorry, if there is a common
20    law analog 4(A) and a intangible harm, we have to have an
21    intangible harm that is actually identified.  And here,
22    plaintiff has admitted the confiscation of the property is
23    not his harm.
24              But the second point is that even if he was
25    claiming it was, unjust enrichment is not an analog here
```

because (A) that is not what Helms-Burton provides.   There

is a sole measure of statutory damages under Helms-Burton,

and it is the entire value of the property trafficked

completely disconnected from the gains of any defendant

trafficking.

So under plaintiff's cause of action, and under

the statute, assuming all of the other requirements were

met, plaintiff would prove one booking of one hotel room

and then claim to be entitled to the entire value of the

property, not the profits from that booking.   There is no

alternative measure of damages.

So Helms-Burton does not reflect unjust

enrichment.   It doesn't look like an unjust cause of

enrichment at all.

Second.   Unjust enrichment is a remedy usually

that can only be asserted by the person who owns the

property, right?   So there are restitutionary, all sorts

of restitutionary theories of liability for someone who

has property taken from them.   There is constructive trust.

There is some level of disgorgement, but they still have to

have a concrete injury related to the property.   Usually it

is ownership of the property or some legal right to the

property, and here there is no such right.

There is simply no common law analog for a cause

of action granted to an individual who never owned a piece

1    of property but who nevertheless will get to recover the

2    value of that property especially when the property is

3    located in a foreign country whose government does not

4    recognize even that person's ancestor's ownership right to

5    that property.

6              THE COURT:  All right.  What about the corporate

7    entity that holds the claim and the lack of any statute of

8    limitations effectively when that is the holder of the claim?

9              MR. SHANK:  One.  I think that is correct.  I

10   think corporations obviously can live forever.  And if they

11   don't make any subsequent transfers of the claim, which, of

12   course, would not be permitted, the practical result of the

13   law that Congress wrote will allow corporations to collect

14   on claims when frankly the individuals who hold claims may

15   not live long enough to do so.

16             But that doesn't mean that the entire -- that

17   the bar that Congress wrote is somehow absurd or can't be

18   applied.  And it doesn't mean that Congress didn't still

19   have a conceivable justification for making this bright line

20   rule that has this sort of unintended consequence.

21             Just because they didn't write the perfect law

22   doesn't mean that the courts are free to abandon the law

23   they wrote and instead try to write the perfect law.  All

24   that is required to satisfy or to avoid the absurd results

25   doctrine is to show that there was some conceivable

1   justification for this interpretation.  And here, there

2   obviously was, even if it didn't capture this issue of

3   corporations.

4            The second thing I will say on that is there are

5   reasons to believe that corporate -- claims of corporations

6   will not be as difficult to handle as claims that are going

7   to be held through chains of succession and inheritance.  I

8   mean some of the claims in Florida, I know the plaintiff's

9   counsel said it is not really that long of a chain, but I

10  mean we've had cases in Florida, we're talking about four

11  generations of inheritance we're dealing with in various

12  countries.

13           Corporations.  One, they have recordkeeping

14  requirements.  They're likely to do things more formally of

15  what they're doing.  But also it is a different animal than

16  multiple inheritances over time that can be governed by

17  different state's law, that can have multiple fact issues

18  as to whether those inheritances are valid.  You can have

19  competing claims of those inheritances, but a corporation

20  that just continues to hold that same asset for 100 years

21  doesn't raise those types of complex issues.

22           THE COURT:  All right.  And, finally, if you

23  would just talk briefly a little bit more about why the

24  notice letter doesn't change whether the plaintiff had pled

25  scienter.

1              I understand a lot of your argument to be I

2    think more going to evidence, you know, you might have a

3    reason you don't change your behavior immediately, but why

4    is it not sufficiently specific allegations of intent and

5    knowledge that you continued to traffic in these properties

6    after being told that they were in fact confiscated

7    properties?

8              MR. SHANK:  Because if that were sufficient

9    fact, then there would be -- scienter would be adequately

10   pleaded in every single case, which would erase it

11   essentially as a hurdle, you know, and I think a wise hurdle

12   to plaintiffs to assert these kinds of cases.  Because there

13   is a provision in the statute, Your Honor, that requires the

14   sending of that notice 30 days before suit in order to get

15   the full amount of damages that are permitted under the

16   statute.

17             So these notices are going to be sent in every

18   single case.  And in most cases, the trafficking behavior

19   that is being alleged is not something that can just be

20   immediately stopped the moment there is a notice provided

21   without breaching all sorts of other obligations, I would

22   imagine.

23             So it simply would make the scienter requirement

24   not a requirement at all, at least at the pleading stage.

25   And I think the Supreme Court and the Third Circuit has made

1    perfectly clear that scienter requirements have the same

2    pleadings standards as any other requirement, and allowing

3    a sort of statutorily required demand notice to satisfy the

4    requirement would simply write it out of the statute.

5              THE COURT:  Okay.  Thank you.

6              I know we're beyond time but I think Visa wanted

7    a few minutes.  And then, Mr. Boneau, if you want to have a

8    few words, we'll permit that as well.  But first, to Visa.

9              MR. DOMB:  Good afternoon, Your Honor.  This is

10   Martin Domb from the Ackerman law firm.

11             I won't take time to go over the various points

12   made on behalf of all defendants which we agree with.  The

13   case should not survive the main issues of issue preclusion,

14   standing, and the failure to acquire a claim before the

15   statutory cutoff.

16             If the Court should reach the alternative ground

17   of knowing and intentional -- requirement that the conduct

18   be knowing and intentional, the Court -- Your Honor has

19   pointed out that one of, Visa stands on a different factual

20   footing, vis-à-vis all the other defendants.

21             When Visa received its pre-suit notice, it

22   promptly instructed its acquiring bank, and that is the

23   bank that actually has the contact and contracts with the

24   hotels in question, to immediately stop authorizing Visa

25   charges at the hotels.

1          The plaintiff acknowledged that in its original

2    complaint, paragraph 68; and in its amended complaint,

3    paragraph 73.  And the plaintiff argued in his reply brief,

4    at page 22, that MasterCard but not Visa continued to

5    traffic after receiving the pre-suit letter.

6          Now, why is this significant?

7          Before Visa received that pre-suit letter, it

8    had no way of knowing anything about Glen's claim.  It

9    didn't know who Mr. Glen was or that he claimed an interest

10   in property, or that that property was confiscated.  And

11   certainly Visa did not intend to do acts which could be

12   deemed trafficking in that property.

13         So, now, I believe that on the scienter issue,

14   the plaintiff hasn't pleaded facts as to any of the

15   defendants and on that, if the Court reaches it, there

16   should be a dismissal on that as to all defendants, but

17   even more so as to Visa for the reasons I stated.

18         Thank you, Your Honor.

19         THE COURT:  Thank you very much.

20         Mr. Boneau, did you want a few minutes?

21         MR. BONEAU:  Just a couple, Your Honor.  And I

22   won't belabor any points we discussed pretty substantially

23   here.

24         But just on the residential exception, I think

25   that Your Honor's question was really getting to the point,

1    which is the definitional issue that the defense counsel

2    pointed to was meant to protect Cuban citizens, but the

3    point that plaintiffs were making had nothing really to do

4    about with Cuban citizens.  It was about third parties

5    providing services or products to Cuban citizens.  And that

6    is what the residential exception, excuse me, that was pled

7    that defendants have raised, that is what it was meant to

8    address.

9           And then the other issue is the term "unjust

10   enrichment" does arise in the congressional findings here.

11   I believe it is in 6081-8, Congress actually references

12   unjust enrichment in its findings about what is happening

13   here in these Helms-Burton, in the Title III cases.

14          Unless Your Honor has any additional questions,

15   I know we've been on the phone for quite some time now, so

16   I don't want to just restate things that have already been

17   discussed.

18          MR. DUBBIN:  Your Honor, this is Sam Dubbin.

19   Could I take 10 seconds?

20          THE COURT:  Certainly.

21          MR. DUBBIN:  Only to say the argument that

22   the amici submitted about the absurd result was within the

23   framework of the natural -- the more natural reading test

24   that the Supreme Court held was applicable when you have

25   language that is being interpreted, as it did in the *J.M.*

1   case, February 2019.  That the statutory text and context

2   clearly stated and enacted in legislative findings and the

3   legislative record lead to the more natural interpretation

4   that inheritance would not be barred.

5           THE COURT:  Okay.  Thank you.

6           Mr. AKOWUAH:  Your Honor, this is Kwaku Akowuah

7   for the MasterCard entities.  I tried to jump in before

8   Mr. Boneau.  I was on mute.  So if you will indulge me for

9   just 30 seconds?

10          There was, on collateral estoppel, a suggestion

11  that the allegations against the credit card companies are

12  different.  But if I could refer the Court simply to the

13  allegations of the complaint as to injury, you will see

14  identical language in paragraph 83 of the amended complaint

15  as to the credit card companies and paragraph 170 of the

16  second amended complaint as to American Airlines, and as to

17  both the claimed injury as to the wrongful trafficking

18  period.  And really, you know, from a description of the

19  companies' conduct perspective, the credit card companies,

20  alleged conduct in processing the transactions, the payment

21  for the rooms is really just a flip side of the booking

22  companies' action in reserving the hotel.

23          So as to collateral estoppel, we don't see a

24  difference and would submit, as has been argued, that

25  collateral estoppel falls foursquare to the credit card

1    companies as well as the travel companies.

2              THE COURT:  Okay.  Thank you very much.  Thank

3    you to all counsel for the very helpful argument.  I will

4    take all of this under advisement.  If I need anything

5    further from you, I will let you know.  In the meantime,

6    everybody stay safe, and thank you again for the helpful

7    argument.  We will be in recess.  Bye-bye.

8              (The attorneys respond, "Thank you, Your Honor.")

9              (Telephonic motions hearing ends at 2:33 p.m.)

10

11        I hereby certify the foregoing is a true and accurate
     transcript from my stenographic notes in the proceeding.

12

13                          /s/ Brian P. Gaffigan
                          Official Court Reporter
14                          U.S. District Court

15

16

17

18

19

20

21

22

23

24

25